# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

330 West Keefe Avenue, Apartment #6, Milwaukee,
Wisconsin

)
)
)
)
)
)

Case No. **18-M-119 (DEJ)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, sections 841 and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent George Mason, FBI
_____
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Aug. 8, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Honorable David E. Jones, U.S. Magistrate Judge
_____
*Printed Name and Title*

## ATTACHMENT A

**LOCATION TO BE SEARCHED:**

**330 West Keefe Avenue Apartment #6, Milwaukee, Wisconsin**

Multi-unit apartment complex having a tan brick exterior with grey trim around the windows and a black tar roof. The numbers "330" are displayed in a horizontal fashion to the west of the south facing front entry door. Apartment #6 is located on second floor southwest corner there is no number displayed on the white wood door. Apartment #6 is located directly across the hallway across from Apartment #5.

## ATTACHMENT B

**ITEMS TO BE SEIZED:**

1. Any illegal drugs or controlled substances, paraphernalia associated with controlled substances including scales and other weighing devices as well as packaging materials and containers used to package controlled substances;

2. Proceeds of drug trafficking activities, including United States currency;

3. Firearms, ammunition, magazines, gun boxes, firearm purchase records or receipts, and other paraphernalia associated with firearms;

4. Sentry Safe;

5. All bank records, checks, credit card bills, account information, and other financial records; financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

6. Lists of drug customers and related identifying information;

7. Personal address books, telephone bills, photographs, letters, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

8. Documents and deeds reflecting the purchase or lease of items obtained with the proceeds from drug trafficking activities;

9. Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

10. Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data.

11. Indicia of occupancy, residency or ownership of the premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys.

26

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, George Mason, a Special Agent with the Federal Bureau of Investigation, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a residential dwelling described in Attachment A, and the extraction from that property of evidence described in Attachment B.

2. I am a Special Agent (SA) with the United States Department of Justice, Federal Bureau of Investigation (FBI). I am currently assigned to the Southeastern Wisconsin Regional Gang Task Force. I have received training in the investigation of drug trafficking. I have worked with informants in the investigation of drug trafficking. I have participated in search warrants, investigations, and arrests in which controlled substances and drug paraphernalia were seized. I am familiar with the street names of various drugs in the Milwaukee area including marijuana, heroin, and cocaine. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale. I have drafted warrants as it relates to criminal investigations. I know through training and experience the importance of Global Positioning System (GPS) warrants to gather intelligence of the suspect operating the target cellphone. Furthermore, GPS warrants reduce the risk of conducting personal surveillance, which has a greater risk of being detected than electronic surveillance. Through my training and experience, I know that drug dealers are not on a regular

1

schedule and can conduct drug deals at any time of the day. GPS tracking allows investigators to constantly monitor a cellphone's location even when an investigator is not personally conducting surveillance.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

4.      Prior to serving as a Special Agent, I was a sworn Kansas Law Enforcement Officer in the City of Prairie Village for over five years. I participated in the investigation of narcotics-related offenses, resulting in the arrest and prosecution of numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidence of criminal activity. As an investigator, I have interviewed many individuals involved in criminal activity and have obtained information from them regarding acquisition, sale, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and some terminology utilized by the traffickers and abusers of controlled substances. I have participated in numerous aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, analysis of phone and financial records, and arrests of drug offenders. I have spoken on numerous occasions with other experienced narcotics investigators, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses regarding the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have

become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds.

5.     I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals distribute controlled substances in the United States.

6.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale.

7.     I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

8.     I know that drug traffickers often use various communication devices to conduct drug trafficking operations, and that drug traffickers often communicate on cellphones using text messages and direct connect cellphone capabilities. I know that multiple calls short in duration are indicative of drug trafficking activities.

9.     I know that drug traffickers commonly have firearms, ammunition, and records or receipts pertaining to such in their possession and at their residences and other locations where they exercise dominion and control.

10.     I know that drug traffickers often list their telephones in nominee names in order to distance themselves from telephones that are used to facilitate drug trafficking;

3

and that drug traffickers frequently change phone numbers in an effort to thwart law enforcement.

11.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement.

12.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

13.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

14.     As detailed below, I believe that there is probable cause that located within the following property in the City of Milwaukee, further described in Attachment A, are items that constitute evidence of drug trafficking, including violations of Title 21, United States Code, sections 841 and 846.

4

## IDENTIFICATION OF PREMISES AND VEHICLES TO BE SEARCHED

15.    That affiant is requesting permission to execute a search warrant at the following property:

A.    **330 West Keefe Avenue, Apartment #6, Milwaukee, Wisconsin**
Multi-unit apartment complex having a tan brick exterior with grey trim around the windows and a black tar roof. The numbers "330" are displayed in a horizontal fashion to the west of the south facing front entry door. Apartment #6 is located on second floor southwest corner there is no number displayed on the white wood door. Apartment #6 is located directly across the hallway across from Apartment #5.

16.    The applied-for warrant would authorize the search and recovery of evidence particularly described in Attachment B.

## PROBABLE CAUSE

17.    The Federal Bureau of Investigations (FBI) Gang Task Force (GTF), which includes Special Agents of the DEA, FBI, and federal Task Force Officers, are conducting an investigation into the criminal activities of James T. Harris (Age: 52) and his Drug Trafficking Organization (DTO) as it relates to the trafficking of heroin into Milwaukee, Wisconsin between January 2016 to the present.

18.    In 2017, members of the FBI GTF, developed a confidential source (hereinafter referred to a CS1). CS1 was a heroin dealer for James Coleman, who is a member of the Harris DTO. CS1 stated that between January 2017 and April 2017, s/he worked as a heroin dealer for James Coleman out of 2655 N. 15th Street, Milwaukee, WI.

5

In 2017, CS1 began working for Coleman after James Harris requested that CS1 become one of Harris' heroin dealers.

19.     For several reasons, case agents believe that CS1 is reliable and credible. First, CS1 has been providing continuous information since March of 2017. Second, the information CS1 has provided is substantially against CS1's penal interest. Third, the information provided by CS1 is consistent with evidence obtained elsewhere in this investigation where CS1 was not utilized, and substantial portions of CS1's information have been corroborated through independent investigation, including surveillance and information from other sources. Finally, CS1 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS1 is cooperating in exchange for credit towards CS1 pending criminal case. CS1 has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, controlled buys, and other witness and law enforcement reporting.

20.     In early 2017 and while inside of 2773A N. 41st Street, Milwaukee, WI, CS1 saw Harris packaging a half-kilo of heroin for sale, and s/he saw Harris use Dormin as a cutting agent prior to its packaging.

21.     CS1 identified James Coleman, Kurt Parks, Roderick Ramsey, and Todd McGown as heroin traffickers who purchased their heroin from Harris between January 2017 and April 2017. CS1 also personally observed Roderick Ramsey, Harris' nephew, deliver heroin to Coleman for sale.

6

22. CS1 further stated that Harris once called CS1 and told him/her that Harris was in Chicago picking up heroin from his source of supply.

23. In 2017, members of the FBI GTF, developed a confidential source (hereinafter referred to as CS4). CS4's information dates from January 2017 to the present.

24. For several reasons, case agents believe that CS4 is reliable and credible. First, CS4 has been providing continuous information since approximately June of 2017. Second, the information CS4 has provided is substantially against CS4's penal interest. Third, the information provided by CS4 is consistent with evidence obtained elsewhere in this investigation where CS4 was not utilized, and substantial portions of CS4's information have been corroborated through independent investigation, including surveillance and information from other sources. Finally, CS4 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS4 is cooperating in exchange for monetary compensation. CS4 has provided law enforcement with timely and accurate information corroborated by law enforcement through consensually recorded conversations, controlled buys, and other witness and law enforcement reporting.

25. CS4 is an associate of the Harris DTO and is intimately familiar with aspects of the Harris DTO. CS4 stated that Harris is large heroin dealer in Milwaukee, and his main partner is Nequann Terry, Harris' son. CS4 has observed Terry packaging and distributing heroin several times in Milwaukee since January 2018 in Terry's vehicle and at 330 West Keefe, Apartment #5, Milwaukee and at 2773A North 41st Street, Milwaukee.

7

CS4 has observed Harris front (allowing narcotics to be sold on credit) heroin to Terry approximately 40 times since January 2017.

26.     CS4 observed Harris on multiple occasions distribute heroin to Nequann Terry, James Coleman, Kurt Parks, and Marques Williams. CS4 stated that s/he personally observed Harris front heroin to: (1) Nequann Terry at 330 West Keefe Avenue Apartment 5, Milwaukee, WI; (2) James Coleman at 2665 North 15th Street, Milwaukee, WI; (3) Kurt Parks at 2773A North 41st Street, Milwaukee, WI; and (4) Marques Williams at 3071A North 19th Street, Milwaukee, WI.

27.     CS4 further identified Kurt Parks' heroin workers as Don Tillman, Antoine Jeff, and Casey Johnson. CS4 saw Antoine Jeff purchase a half-ounce of heroin from Harris approximately two to three times from June 2017 to August 2017 at 3261 North 30th Street, Milwaukee, WI. CS4 identified Marques Williams as a heroin trafficker who receives his heroin supply from Harris and Terry at 3071A North 19th Street, Milwaukee, WI.

28.     CS4 also believes that Harris receives his heroin from a relative in Chicago because he heard Harris and Kurt Parks discussing that arrangement.

29.     In 2018, members of the FBI GTF developed a confidential source (hereinafter referred to as CS6).

30.     For several reasons, case agents believe that CS6 is reliable and credible. First, CS6 has been providing continuous information since April of 2018. Second, the information provided by CS6 is consistent with evidence obtained elsewhere in this investigation where CS6 was not utilized, and substantial portions of CS6's information

8

have been corroborated through independent investigation, including surveillance and information from other sources. Finally, CS6 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS6 is cooperating in exchange for credit towards CS6 pending criminal case.

31.     CS6 stated s/he had been purchasing heroin three times a week from a subject s/he know as "Rah Rah" since June/July of 2017 at 3044 North Richards Street, Milwaukee, WI, and at an apartment of the lower northeast corner of the an apartment complex located at 5800 North 91st Street, Milwaukee, WI. Case agents know "Rah Rah" to be Roderick Ramsey, who is James Harris nephew. Case agents showed CS6 a Milwaukee Police Department booking photo of Roderick Ramsey, which CS6 positively identified as the subject CS6 knows as "Rah Rah."

32.     CS6 stated that in May 2018, s/he observed James Harris at Roderick Ramsey's residence 3044 North Richards Street, Milwaukee, WI, when CS6 was purchasing heroin from Ramsey. In May 2018, CS6 positively identified a photograph of James Harris, but did not know what Harris' name was. CS6 stated that while CS6 was purchasing heroin from Ramsey at 3044 North Richards Street, Milwaukee, CS6 observed James Harris walk from a back room during the drug deal with Ramsey. In late July 2018, CS6 also stated that Ramsey was still actively selling heroin out of 3044 North Richards Street, Milwaukee and 5800 North 91st Street, Milwaukee.

33.     In 2017, members of the FBI GTF, developed a confidential source (hereinafter referred to as CS7).

9

34.     For several reasons, case agents believe that CS7 is reliable and credible. First, CS7 has been providing continuous information since April of 2018. Second, the information provided by CS7 is consistent with evidence obtained elsewhere in this investigation where CS7 was not utilized, and substantial portions of CS7's information have been corroborated through independent investigation, including surveillance and information from other sources. Third, CS7 has made statements to case agents that are against his/her penal interests, in that CS7 has admitted his/her involvement in the Harris DTO's activities in the past. Finally, CS7 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS7 is cooperating in order to be a good citizen and potential future monetary compensation.

35.     CS7 stated that Harris' source of supply is Stanley George and that the purchases of heroin occur at Harris' mother's residence in Chicago. CS7 saw Harris purchase heroin from George over 10 times between February 2016 to December 2018. Each time Harris purchased heroin, it was never less than a kilo. The FBI was able to verify the identity of Stanley George and verified that Harris' mother does reside in Chicago. CS7 identified Adline Harris, Harris' wife, as a person who often transports heroin from Chicago to Milwaukee for the Harris DTO.

36.     In 2018, members of the FBI GTF, developed a confidential source (hereinafter referred to as CS8).

37.     For several reasons, case agents believe that CS8 is reliable and credible. First, the information provided by CS8 is consistent with evidence obtained elsewhere in

this investigation where CS8 was not utilized, and substantial portions of CS8's information have been corroborated through independent investigation, including surveillance and information from other sources. Second, CS8 has made statements to case agents that are against his/her penal interests, in that CS8 has admitted his/her involvement in the Harris DTO's activities in the past. Finally, CS8 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. CS8 is cooperating in exchange for consideration in a pending criminal case.

38.     CS8 worked with the Harris DTO from spring 2016 to spring 2017. CS8 saw Harris receive heroin from a Chicago source. CS8 saw Harris package heroin almost every day, and CS8 saw Harris cut the heroin with Dormin. CS8 assisted the packaging of Harris' heroin, and s/he said that Harris would receive approximately 2-3 kilos of heroin every month. CS8 saw James Coleman and Kurt Parks purchase heroin almost every day from Harris – at times, Harris fronted the heroin to James Coleman and Kurt Parks.

39.     On January 31, 2018, the FBI GTF conducted a garbage pick at one of Harris' former drug locations (2773A N. 41st Street, Milwaukee) and located Dormin (heroin cutting agent), corner cuts that tested positive for the presence of heroin, and identifiers for Harris and Nequann Terry. This further corroborates the confidential source information.

40.     The investigation into the Harris DTO included an investigative technique known as a "controlled buy." Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from a

11

target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. All of the calls to the target by the informants are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informants dial the target's number on each occasion and the contact is verified through telephone records. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures.

41.     The below controlled buys are believed to be connected to members or associates of the Harris DTO:

- On April 22, 2017, the FBI GTF conducted a controlled buy of heroin from James Coleman of 2.52 grams of heroin at 4200 W. Stark Street, Milwaukee.

12

- On April 24, 2017, the FBI GTF conducted a controlled buy from James Coleman of 4.3 grams of heroin at 1200 W. Garfield Avenue, Milwaukee.

- On May 12, 2017, the FBI GTF conducted a controlled buy from James Coleman of 9.11 grams of heroin at 2655 N. 15th Street, Milwaukee. During the controlled buy, James Coleman. The CI stated that Skinner was selling heroin to other buyers during the controlled buy (this was not captured on the recording).

- On May 24, 2017, the FBI GTF conducted a controlled buy from James Harris and Roderick Ramsey of 7.8 grams of heroin at 2773 N. 41st Street, Milwaukee. CS1 called Harris who directed CS1 to call Roderick Ramsey to fulfill the request. CS1 called Ramsey who sold the heroin to CS1.

- On July 21, 2017, the FBI Task Force conducted a controlled buy from Don Tillman of 2.2 grams of heroin at 2605 N. 26th Street, Milwaukee. During the controlled buy, CS4 called Parks who told him to complete the purchase with his worker, "Don."

- On July 25, 2017, FBI GTF conducted a controlled buy from Antoine Jeff of 3.1 grams of heroin at 3261 North 30th Street, Milwaukee.

- On August 2, 2017, FBI GTF conducted a controlled buy from Antoine Jeff of 2.5 grams of heroin at 3261 North 30th Street, Milwaukee. During the controlled buy, CS4 contacted Tillman who

13

told the CS that he did not have heroin because Parks was arrested so he should call Jeff.

- On August 7, 2017, the FBI Task Force conducted a controlled buy from Don Tillman of 3.7 grams of heroin at 2869 N. 26th Street, Milwaukee. During the controlled buy, Tillman told CS4 that he was waiting for Parks to drop off some heroin for him to sell.

- On August 27, 2017, the FBI Task Force conducted a controlled buy from Don Tillman of 3.07 grams of heroin at 2869 N. 26th Street, Milwaukee.

- On October 12, 2017, the FBI Task Force conducted a controlled buy from Don Tillman of 2.37 grams of heroin at 2869 N. 26th Street, Milwaukee.

- On April 10, 2018, the FBI GTF conducted a controlled buy from Todd McGown of 2.39 grams of heroin at 3110 North 35th Street, Milwaukee.

- On April 12, 2018, FBI GTF conducted a controlled buy from Todd McGown of 4.5 grams of heroin at 3110 North 35th Street, Milwaukee.

- On April 17, 2018, FBI GTF conducted a controlled buy from Casey Johnson of 2.83 grams of heroin at 3069 North 29th Street, Milwaukee. During the controlled buy, CS4 spoke to Terry who said call his guy "KC."

14

- On April 20, 2018, FBI GTF conducted a controlled buy from Casey Johnson of 4.87 grams of heroin at 3069 North 29th Street, Milwaukee.

- On May 15, 2018, FBI GTF conducted a controlled buy from Antoine Jeff of 1.55 grams of heroin at 3261 North 30th Street, Milwaukee.

- On May 17, 2018, FBI GTF conducted a controlled buy from Todd McGown of 4.5 grams of heroin at 3500 West Fond Du Lac Avenue, Milwaukee.

- On May 21, 2018, FBI GTF conducted a controlled buy of heroin from Roderick Ramsey of 1.02 grams of heroin at 2940 North 21st Street, Milwaukee.

- On May 24, 2018, FBI GTF conducted a controlled buy of heroin from Nequann Terry of 2.06 grams of heroin at 6016 North 61st Street, Milwaukee. During the controlled buy, CS4 spoke with Harris and Terry outside of 6016 North 61st Street, and at that time, Harris directed Terry to "Take care of that business." Shortly after, CS4 and Terry entered the residence, and CS4 conducted the purchase of heroin from Terry.

- On May 29, 2018, FBI GTF conducted a controlled buy from Roderick Ramsey of .55 grams of heroin at 5800 North 91st Street, Milwaukee.

- On May 30, 2018, FBI GTF conducted a controlled buy from Nequann Terry of 1.97 grams of heroin at 1845 West Hopkins Street, Milwaukee.

- On June 4, 2018, the FBI GTF conducted a controlled buy from James Coleman of .16 grams of heroin from 2655 N. 15th Street, Milwaukee.

- On July 10, 2018, the FBI GTF conducted a controlled buy from "Luther" at the direction of Marques Williams of 2.05 grams of heroin in the area of 3071 N. 19th Street, Milwaukee.

- On July 12, 2018, the FBI GTF conducted a controlled buy from "Luther" at the direction of Marques Williams of 2.98 grams of heroin in the area 3071 N. 19th Street, Milwaukee.

- On July 25, 2018, the FBI GTF conducted a controlled buy from Antoine Jeff of 1.8 grams of heroin from 3261 North 30th Street, Milwaukee.

- On July 25, 2018, the FBI GTF conducted a controlled buy from "Herron" at the direction of Todd McGown of 2.93 grams of heroin in the area 3110 North 35th Street, Milwaukee.

- On July 25, 2018, the FBI GTF conducted a controlled buy from "Luther" of 2.71 grams of heroin in the area of 3071 N 19th Street, Milwaukee.

16

- On July 30, 2018, the FBI GTF conducted a controlled buy from Roderick Ramsey of 0.58 grams of heroin in the area of 3044 North Richards Street.

**330 West Keefe Avenue, Apartments #5, Milwaukee, Wisconsin**

42.     Agents of the FBI GTF believe that 330 West Keefe Avenue, Apartment #5, Milwaukee, WI, is occupied by Nequann Terry. On July 11, 2018, Nequann Terry updated his Wisconsin Department of Transportation address to 330 West Keefe Avenue Apartment #5, Milwaukee, WI. James Harris and Nequann Terry are the listed as the utilities subscribers through WE Energies for 330 West Keefe Avenue, Apartment #5, Milwaukee, WI.

43.     In the mid-June 2018, CS4 was inside of 330 West Keefe Avenue Apartment #5 when s/he saw James Harris bring an unidentified amount of heroin into the apartment complex. CS4 stated that s/he observed Nequann Terry with a firearm in Apartment #5 within the last 60 days. CS4 identified Terry as a current heroin dealer for the Harris DTO who resides at and furthers heroin trafficking at 330 West Keefe Avenue, Apartment #5, Milwaukee, WI.

44.     CS4 stated that the entry door to Apartment #5 is barricaded. The barricades consist of a horizontal 2x4 across the door and a 2x4 inserted into a floor bracket which provides additional fortification. I know that from training and experience that drug dealers use fortification in order to secure their residences from law enforcement and others individuals attempting to gain access to their residence.

45.     On February 17, 2018, Milwaukee police officers were dispatched to a

17

property damage complaint at 330 West Keefe, Milwaukee, WI. The caller stated that her landlord was "J. Harris" with a cellphone number of 414-595-7809. Case agent know this to be one of James Harris's cellphone numbers.

46.     Based off electronic and physical surveillance, case agents have placed James Harris at 330 West Keefe Avenue over 100 times, most recently on July 24, 2018. In addition, case agents case agents have placed Nequann Terry at 330 West Keefe through physical surveillance approximately 10 times, most recently on July 24, 2018.

47.     Case agents also observed James Harris 2013 Cadillac XTS, with Wisconsin license plate 659-ZHL parked at 330 West Keefe on over 25 occasions, most recently on July 25, 2018. Law enforcement verified that this vehicle is registered through WI DOT to James Harris Trust and used by Harris. Case agents have observed Harris driving the Cadillac XTS over 20 times.

48.     In my training and experience as a federal agent, I know that it is a common for a drug trafficker's residence to contain evidence of drug trafficking, such as contraband, proceeds, and records.

### 330 West Keefe Avenue, Apartment #6, Milwaukee, Wisconsin

49.     330 W. Keefe Avenue, Apartment #6, Milwaukee, is occupied by Felicia Powell (DOB 09/19/1967). Felicia Powell is the listed utilities subscriber through WE Energies for 330 West Keefe Apartment #6.

50.     CS4 stated that in the middle of June of 2018 s/he witnessed Nequann Terry with a firearm in Apartment #5. CS4 stated that s/he was with Terry in Apartment #5 when CS4 witnessed Terry go into Apartment #6. CS4 stated s/he heard Powell tell Terry

18

that "the heroin is in the drawer." CS4 witnessed Terry exit Apartment #6 with an unidentified amount of suspected heroin and reenter Apartment #5.

51.     In early June of 2018 CS4 stated that s/he had witnessed Felicia Powell bagging up heroin in Terry's apartment, Apartment #5.

52.     On August 8, 2018, FBI GTF conducted a knock and talk at 330 W. Keefe Avenue, Apartment #6, Milwaukee. When the agents entered the residences they located, in plain sight, multiple boxes of ammunition of .45 caliber and 9mm rounds; a locked Sentry Safe; and marijuana packed into a cigar. The agents froze the scene to obtain this search warrant. Based on the evidence in plain sight as well as the historical information from CS4, there is probable cause to search the apartment for narcotics and firearms related evidence.

## CONCLUSION

53.     Based on the facts contained within this affidavit, case agents believe that there is probable cause that James Harris, Adline Harris, James Coleman, Kurt Parks, Nequann Terry, Roderick Ramsey, Todd McGown, Casey Johnson, Don Tillman, Antoine Jeff, and Marques Williams are heroin traffickers. Case agents further believe that there is probable cause to search the aforementioned location for evidence pertaining to the fruits, instrumentalities, and proceeds of drug trafficking, all of which are detailed more specifically in Attachment B, items to be seized.

## TECHNICAL TERMS

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

19

55.     Wireless telephone:   A wireless telephone (or mobile telephone, or cellphone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

56.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

57.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

58.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

60.     There is probable cause to believe that things that were once stored on the devices may still be stored there, for at least the following reasons:

61.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files

21

downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

62. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

63. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

64. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

65. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as

22

direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

66.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

67.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

68.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

69. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

70. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

71. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

72. Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## ATTACHMENT A

**LOCATION TO BE SEARCHED:**

**330 West Keefe Avenue Apartment #6, Milwaukee, Wisconsin**

Multi-unit apartment complex having a tan brick exterior with grey trim around the windows and a black tar roof. The numbers "330" are displayed in a horizontal fashion to the west of the south facing front entry door. Apartment #6 is located on second floor southwest corner there is no number displayed on the white wood door. Apartment #6 is located directly across the hallway across from Apartment #5.

# ATTACHMENT B

**ITEMS TO BE SEIZED:**

1.   Any illegal drugs or controlled substances, paraphernalia associated with controlled substances including scales and other weighing devices as well as packaging materials and containers used to package controlled substances;

2.   Proceeds of drug trafficking activities, including United States currency;

3.   Firearms, ammunition, magazines, gun boxes, firearm purchase records or receipts, and other paraphernalia associated with firearms;

4.   Sentry Safe;

5.   All bank records, checks, credit card bills, account information, and other financial records; financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

6.   Lists of drug customers and related identifying information;

7.   Personal address books, telephone bills, photographs, letters, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

8.   Documents and deeds reflecting the purchase or lease of items obtained with the proceeds from drug trafficking activities;

9.   Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

10.   Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data.

11.   Indicia of occupancy, residency or ownership of the premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).